In re The BRIARCLIFF, a limited Partnership, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION.

No. 86–5022.

United States Court of Appeals, Third Circuit.

Argued July 22, 1986.

Decided Sept. 15, 1986.

Rehearing Denied Oct. 10, 1986.

David N. Ravin (argued), Bernard Schenkler, Ravin, Sarasohn, Cook, Baumgarten & Fisch, West Orange, N.J., for The Briarcliff.

Sheppard A. Guryan, William B. Kohn (argued), Lasser, Hockman, Marcus, Guryan and Kuskin, Roseland, N.J., for Federal Deposit Ins. Corp.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The Briarcliff, a limited partnership debtor in reorganization under Chapter XII of the Bankruptcy Act of 1898, 11 U.S.C. §§ 801–926 (1976), appeals from an order of the district court, which affirmed an order of the bankruptcy court denying its motion to compel the Federal Deposit Insurance Corporation (FDIC) to pay over to it $2,041,981. This amount represented part of the proceeds of a real estate sale. The bankruptcy court and the district court held that under the terms of a contract between the Briarcliff and the FDIC the latter was entitled to the $2,041,987. We affirm.

### I.

Prior to filing its petition for a real property arrangement under Chapter XII of the Bankruptcy Act of 1898, the Briarcliff owned a 30-story luxury rental apartment building in Cliffside Park, New Jersey. A first mortgage on that building was held by the FDIC in the principal amount of $13,-450,000. In 1977 the mortgage fell into default, and the Briarcliff filed its Chapter XII petition. Appellant's Appendix at 156–57, ¶ 4. Negotiations between the Briarcliff and the FDIC concerning a mutually acceptable arrangement followed, during which it became apparent that it would be necessary to convert the rental apartment building into a condominium or cooperative. Ultimately, 250 Gorge Road Realty Corporation (Gorge) was designated to purchase the building and convert it to cooperative ownership. On September 1, 1982, two contracts were entered into reflecting the arrangements between the Briarcliff, the FDIC and Gorge. By then the Briarcliff owed the FDIC $13,450,000 in principal and $5,897,740 in interest secured by the FDIC mortgage—a total of $19,347,740.

One agreement between the Briarcliff and the FDIC is designated the Settlement Agreement. Appellant's Appendix at 77–114. In it the FDIC agrees that its mortgage could be satisfied in one of three manners:

> On or before the date fixed for CLOSING, the Briarcliff shall either (a) pay and satisfy to the FDIC the full SETTLEMENT in the manner set forth in Article 1 of this Agreement; or (b) pay and satisfy the principal of the MORTGAGE and all interest accrued thereon; or (c) cause the FDIC to be vested with good and marketable title to the PREMISES free and clear of all liens and encumbrances.

Article 13 of Settlement Agreement, *reprinted in* Appellant's Appendix at 98–100. The SETTLEMENT referred to, defined in Article 1 of the Agreement, obliged the

FDIC to accept at CLOSING $20,300,000, payable in various forms and over time, in full settlement of its MORTGAGE.[1] Thus, the SETTLEMENT figure exceeded the amount due to the FDIC as of September 1, 1982, by $952,260. The Settlement Agreement also provides:

> During the term of the within Agreement, all net operating cash flow of the PREMISES shall be paid and delivered to the FDIC and said sums as well as all other sums and monies paid or required by the provisions of this Agreement to be paid to the FDIC shall (except to the extent that any sums shall, pursuant to the requirements of the FDIC, be received in satisfaction of other specifically designated items), be paid to the FDIC in reduction of the interest accrued on the MORTGAGE until such time as all of the said interest shall have been fully paid and satisfied and thereafter in reduction of principal. Notwithstanding the foregoing, the FDIC may elect to treat any sums received by it as having been received in repayment or reimbursement to the FDIC for any expenses and disbursements incurred or made by the FDIC to preserve, protect or defend the MORTGAGE ... until all such expenses and disbursements have been paid to it in full.

Article 14 of Settlement Agreement, *reprinted in* Appellant's Appendix at 101.

**1.** Article 1 of the Settlement Agreement provides:

> 1. The BRIARCLIFF agrees to pay to FDIC and FDIC agrees to accept in full satisfaction of the MORTGAGE, the SETTLEMENT in the sum of $20,300,000.00 (it being understood and agreed that all sums paid to and received by FDIC up to the sum of $13,450,000 shall be deemed to constitute repayment of the principal (heretofore advanced) of the MORTGAGE and that the balance of the SETTLEMENT shall be deemed to constitute (i) reimbursement to the FDIC of sums actually heretofore or hereafter advanced pursuant to the MORTGAGE and (ii) interest upon the MORTGAGE) to be paid and satisfied in the following manner:
>
> (a) At CLOSING as set forth herein by cashier's, certified or bank check(s), a sum equal to the aggre-

In Article 15 the Settlement Agreement specified how the payments made pursuant to Article 14 would be accounted for at closing:

> In the event of conveyance of title to the PREMISES to the FDIC or in the event of the payment of the SETTLEMENT pursuant to Paragraph 1 hereof, or in the event of any other termination of this Agreement (other than by reason of payment and satisfaction in full of the MORTGAGE and all interest accrued thereon), all balances in all Reserve accounts created hereunder, after deduction therefrom of amounts necessary to satisfy then presently outstanding invoices properly chargeable to such Reserve accounts (adjusted as of the date of conveyance of title or payment of the principal amount of the MORTGAGE, or the termination of this Agreement) shall be paid to the FDIC; provided, however, that the balance of sums in the tax Reserve account shall be adjusted as of the date of conveyance of title to the FDIC or the date of payment of principal and interest due on the MORTGAGE to the FDIC or the date of payment of the SETTLEMENT or the date of termination of this Agreement (as the case may be) and shall be distributed as follows:
>
> (i) In the event that title to the PREMISES shall be conveyed to the FDIC, or

> gate cash proceeds of all PRESALES and the collection of debts due upon any PAPER and deposits and all interest accrued on said deposits or other consideration received by any person, firm or corporation with respect to PRESALES, but in no event less than:      $ 2,000,000.00
>
> (b) At CLOSING by delivery to the FDIC of the COOPERATIVE MORTGAGE which shall be in the sum of:      $12,500,000.00
>
> (c)(i) At CLOSING by delivery to the FDIC of the FIRST NOTE in the sum of:      $ 4,000,000.00
>
> (ii) At CLOSING by delivery to the FDIC of the SECOND NOTE in the sum of:      $ 1,800,000.00
>
>     TOTAL SETTLEMENT      $20,300,000.00

that the SETTLEMENT shall be paid to the FDIC, or that this Agreement shall be otherwise terminated, the balance of such tax Reserve account shall be delivered to the FDIC;

(ii) In the event that at or before the CLOSING the FDIC shall have received payment in full of all sums due to it on account of the MORTGAGE and all interest accrued thereon, the tax Reserve account balance shall be paid to the BRIARCLIFF.

Article 15 of Settlement Agreement, *reprinted in* Appellant's Appendix at 101–05. This provision for disposition of the reserve account is consistent with the interpretation that the cash flow payments would go to the FDIC whenever the Briarcliff elected to accept the settlement. Thus, unless the Briarcliff should elect the second option in Article 13, of paying off the FDIC mortgage and all accrued interest, Article 15 permits the FDIC to retain Article 14 payments. The parties agree that the Briarcliff was obliged to pay, and did pay pursuant to this agreement, a minimum of $75,000 per month from September, 1982, to the date of closing. Closing was to occur within one year of the date of the Settlement Agreement or within one year of the date the bankruptcy court approved the Briarcliff's plan, so long as such approval occurred within 90 days of September 1, 1982. Provision was made for two six-month extensions in the event the closing did not take place until October 16, 1984. The Settlement Agreement also obliged the FDIC to provide partial financing for Gorge's purchase of the building by accepting a cooperative mortgage in the principal sum of $12,500,000.

The Briarcliff and Gorge simultaneously executed a Sales Agreement in which Briarcliff agreed, subject to the Settlement Agreement, to convey the building to Gorge for a total consideration of $22,550,000. This money was to be payable partially in a letter of credit, partially in cash, partially in unsecured notes, and partially

in a $12,500,000 cooperative mortgage. Most of the cash was to be generated by Gorge from the proceeds of presales of cooperative apartments. Many of the forms of payment coincided with the Briarcliff's undertakings in the Settlement Agreement and in its Chapter XII plan.

The bankruptcy court approved the Settlement Agreement and the Sales Agreement on April 25, 1983, and on May 2, 1983, entered an order conferring the plan, which incorporated the two agreements. Appellant's Appendix at 168–72.

At the closing on October 16, 1984, Briarcliff delivered the *Cooperative Mortgage,* the *First Note* and the *Second Note,* as specified in Article 1 of the Settlement Agreement.[2] Thus, the Briarcliff did not exercise the option of satisfying the FDIC mortgage with accrued interest, and did not deliver a deed conveying the property to the FDIC free and clear of liens. The Briarcliff also paid $2,000,000 in cash, acquired from Gorge under protest. The protest was made because by October 16, 1984, the FDIC had received a total of $7,699,245 pursuant to Article 14 of the Settlement Agreement and provisions of the mortgage. When added to the $20,300,000 Settlement amount, this amount meant that the FDIC received consideration aggregating $27,999,245, whereas the Briarcliff's total indebtedness was $13,450,000 in principal and $12,507,258 in interest—a total of $25,957,258. Thus, the Briarcliff claims that the FDIC was overpaid by over $2 million.

## II.

After the closing the Briarcliff moved in the bankruptcy court for an order directing that the allegedly excess payment be returned. Briarcliff subpoenaed records of the FDIC which it claimed would provide extrinsic evidence in support of its claim that it had been required to pay more at closing than the parties had bargained for. The bankruptcy court quashed the subpoena for FDIC records, ruling that the Settle-

Appellant's Appendix at 88–89.

**2.** *See supra* note 1.

ment Agreement was unambiguous and that resort to extrinsic evidence regarding the intention of the parties would be improper. That court also ruled that under the unambiguous language of the Settlement Agreement the FDIC was entitled to a total consideration at closing of $20,300,-000. The Briarcliff appealed to the district court, which also held that the Settlement Agreement was unambiguous, and that the FDIC was entitled at closing to a total consideration of $20,300,000. This appeal followed.

## III.

On appeal, the Briarcliff contends that the court erred in quashing its subpoena for records of the FDIC which might support its construction of the agreement. It urges that this error requires at least a remand for further proceedings. Alternatively, the Briarcliff asserts that the Settlement Agreement, when construed in light of the simultaneously executed Sales Agreement, obligated it at closing to deliver to the FDIC aggregate consideration not exceeding the total amount then owed to the FDIC on the mortgage. The Briarcliff's theory is that because the Sales Agreement obliged it to sell to Gorge as long as Gorge did not default, the option referred to in Article 13 was not a real option. The Briarcliff contends that it never had any real opportunity to do more than pay in accordance with Article 1 of the Settlement Agreement; hence, no more should be required of it than payment of the FDIC's total indebtedness.

Our analysis starts with the simple and straightforward observation that there is no equivalence, in the real world of money, between a ten-year mortgage for $12,500,-000 as well as unsecured notes for $4,000,-000 and $1,800,000, on the one hand, and $18,300,000 in legal tender, on the other. On September 1, 1981, the FDIC agreed to stand by for up to 27 months during which the Briarcliff could not pay it in cash. The contention that the FDIC is receiving a "windfall" is therefore hyperbolic, to say the least.

■ We are similarly unimpressed with the Briarcliff's argument that the cash option in Article 13 was not a real one. With the benefit of our hindsight knowledge of interest rates during the period in question, we know that this option proved to be of little value. Nevertheless, had the market for cooperative apartments or mortgage interest rates been different, the Briarcliff might well have been able to furnish to Gorge, or Gorge may have obtained for itself, long-term financing at rates or terms more favorable than those to which the FDIC obliged itself. Hence, the option to pay the FDIC in cash, thereby receiving full credit for all payments made in the interim pursuant to Article 14, was a real one in the sense that it preserved for the Briarcliff the opportunity to take advantage of changes in the marketplace favorable to it.

We agree with the bankruptcy court and the district court holdings that the Settlement Agreement is unambiguous. The Agreement proffers three options: It says that the FDIC will take $18,300,000 in paper, as well as the net cash flow from the building prior to closing, and $2,000,000 in cash, or it will take cash, or it will take a deed in lieu of foreclosure. The FDIC did not get a deed in lieu of foreclosure—which would have permitted a resale in the market for cash—and it did not get cash. Instead, the Briarcliff took advantage of its option to have the FDIC stand by for over 27 months and then accept $18,300,000 in paper rather than cash. During the 27–month standby period, the FDIC was at risk that the effort to convert to cooperative ownership would not succeed. Had that occurred it would be highly unlikely that any other lender would facilitate the exercise of the cash payment option for the Briarcliff. Moreover, this would have made it highly likely that the market value of the property after it was deeded to the FDIC would be less than in 1982. Thus, the FDIC was at substantial risk both of losing interest of over $120,000 a month and of suffering increases in liens for local property taxes. Given these risks, the Ar-

ticle 14 provision that the FDIC receive the full benefit of the net cash flow is perfectly understandable and totally unambiguous.

 Having obtained the standby specified in the Settlement Agreement, and having exercised the option of making the FDIC accept $28,300,000 in new paper in lieu of cash, the Briarcliff now asks us to rewrite the unambiguous terms of the Settlement Agreement. We agree with the bankruptcy court and the district court that there is no basis for doing so. We agree, as well, that extrinsic evidence attempting to vary the terms of that unambiguous contract would be inadmissible. The judgment appealed from will therefore be affirmed.